HERMAN C. SCHMITT *v.* STATE OF INDIANA.

[No. 2-1272A146. Filed April 30, 1974. Rehearing denied June 13, 1974. Transfer denied September 25, 1974.]

*James Manahan,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Assistant Attorney General, for appellee.

WHITE, J.—A jury found defendant-appellant Schmitt guilty of selling LSD (Lysergic Acid Diethlamide). He was sentenced to imprisonment for a term of not less than one nor more than ten years and fined $1,000.00. He appeals, contending that (1) the trial court erred in refusing to declare a mistrial when, over defendant's objection, the court admitted testimony to the effect that Schmitt had committed other crimes, and (2) there was insufficient evidence to establish that the substance sold was LSD.

We affirm.

I.

Very briefly, the facts pertinent to the first issue are that one Roy Couts, a Town of Carmel fireman, initiated, by telephone, the contact with defendant Schmitt which resulted in defendant Schmitt meeting Couts and one Terry Jansen, also a Town of Carmel employee, at the Hamilton County home of Couts' sister, Diane Stiltz, where Couts purchased from Schmitt a package of tablets he represented to be LSD. Schmitt also gave one tablet to Jansen. Couts paid Schmitt

with three five dollar bills previously furnished to Couts by David Grose, an Indiana State Trooper. Immediately after the sale Couts and Jansen turned their tablets over to officer Lee Dolen of the Carmel Police Department, who tested one tablet and sent the others to the State Police for tests. He later signed the charging affidavit on which defendant was arrested, tried and convicted. Roy Couts was motivated to involve himself in this transaction by his sister Diane telling him that Schmitt, whom she had been dating, had given her an overdose of LSD.

In this setting it is not surprising that Schmitt attempted to invoke the defense of entrapment. He began the attempt in his cross-examination of Couts, the State's first witness, continued it in other cross-examination during the State's case-in-chief and, at the close of the State's case premised his motion for directed verdict on that ground (and the ground that the evidence was insufficient to prove that the tablets were LSD). It was repeated in his motion to correct errors, but in this appeal he has abandoned it. No issue of entrapment is before us.

To counter defendant's attempt to show entrapment, the State attempted to show "probable cause" by eliciting testimony the police had information that defendant had a reputation for trafficking in drugs. This was proper. As stated in *Walker* v. *State* (1970), 255 Ind. 65, 71, 262 N.E.2d 641, 645, "[w]hen appellant evoked the defense of entrapment he imposed on the State the requirement of proving that it had probable cause of suspecting that the appellant was engaged in illegal conduct."

Now on appeal, after abandoning his entrapment defense, defendant demands a reversal because of the prejudicial effect of this "probable cause" evidence, asserting that "[p]robable cause, of course, was not in issue here nor could it have been at issue before a jury." This argument conveniently overlooks the fact that defendant himself created the probable cause issue by raising the entrapment issue

before the jury and not in a pretrial motion to suppress.[1] But more surprising than the defendant-appellant's failure to mention his entrapment defense is the State's failure to mention it as the reason for its probable cause testimony. But that may be due to the fact that not all of the evidence suggesting defendant's commission of other offenses can be justified as proof of probable cause. One incident appears to have occurred after the sale which defendant contended was entrapment.[2] During the direct examination of Officer Dolen, after he had testified that he did not "personally" serve the warrant on defendant, he was asked what steps he took to do so. Defendant's objection that the question was immaterial because the court would "take judicial notice that the way to invoke criminal process is either by warrant or arrest," was overruled. This followed:

> "Yes, the following Saturday I was waiting near the Carmel Motel for Mr. Schmitt, which he did not appear, and then found that the following morning he had been arrested in Indianapolis.
>
> "DEFENSE COUNSEL: Object and move it be stricken, Your Honor; it's not responsive and is highly inflammatory.
>
> "THE COURT: Objection sustained."

Thereafter, at defendant's request, the jury was excused and defendant moved for a mistrial. After that motion was overruled and the jury returned, the Court stated:

> "Ladies and Gentlemen, that portion of the witness' answer following the words that he did not appear are ordered stricken by this Court and you are admonished that you must totally disregard the balance of the answer and wipe same from your mind."

---

1. See Berger, *The Defense of Entrapment and the Related Rule of Probable Cause,* 18 RES GESTAE (Ind. State Bar Assn., Feb. 1974), No. 2, p. 7.

2. In the *Walker* case, *supra* (255 Ind. 65, 71) the court said:
"We hold that it is not necessary for the officers to have all of the information leading to probable cause prior to the beginning of the investigation. It is sufficient if during the investigation but *before the transaction which is alleged to be entrapment* the officers acquire the information which supplies probable cause." (Our emphasis.)

We can conceive of no valid reason the prosecuting attorney could have had for asking the question and consider it misconduct for him to do so. His response to defendant's motion for mistrial vaguely suggests that he may have thought that the evidence would show probable cause for the police participating in the alleged entrapment, but since it occurred after that event it could hardly be a cause for it.

But notwithstanding the absence of any justification for showing that defendant had been arrested in another county after the alleged offense here being prosecuted, there is insufficient reason to consider it reversible error. Superimposed on the admissible evidence of probable cause and the evidence of defendant's having made the sale with which he was charged, the prejudicial effect of this evidence was certainly minimal. It falls in the same "harmless error" category as did the "evidentiary 'harpoon' " in *Brown* v. *State* (1972), 258 Ind. 412, 281 N.E.2d 801, 802, 30 Ind. Dec. 495.

## II.

The evidence which (arguably, at least) *tends* to prove that the tablets which defendant Schmitt allegedly handed to Couts and Jansen were LSD is the following:

Roy Couts testified that defendant said (over the telephone before the "sale") he had given Cout's sister, Diane, some "acid" the night before and that he had more for sale which Couts could buy. Couts said that by "acid" he meant, "LSD, speed, mescaline, anything like that." In a subsequent telephone conversation (all on the same day, February 28, 1972) it was arranged that Schmitt would come to Diane's house at 9:00 o'clock that night and sell Couts ten "tabs of acid" for Fifteen Dollars. Schmitt arrived at about 11:00 to 11:30 o'clock and there was conversation about the "acid" he had given Diane the night before and about the quality of the "acid" he had brought to sell to Couts. Couts' further testimony concerning the delivery and payment consistently

referred to the substance delivered as "acid", never as "LSD" or "Lysergic Acid Diethlamide". On cross-examination he said "acid" was a "hallucinatory drug", that "acid" is "speed", that it is a "narcotic"; that it's under "the narcotics act." Eventually his cross-examiner began to refer to the tablets purchased as "LSD" and Couts' answers implied that he thought they were LSD, but he never said "LSD", "Lysergic", or "Diethlamide", or any combination thereof; only "acid". He also agreed with this cross-examiner that he could not look at a tablet and tell whether it was LSD.

Terry Jansen testified that at the meeting Roy Couts asked defendant whether he had brought the "LSD" and defendant produced a cellophane packet out of his pocket from which defendant counted out the pills. His testimony never again referred to what the pills were. He did testify that he took to Officer Dolen at the Carmel police station the one pill defendant had given him and that Dolen "got out some type of kit and ran a test on the pill". (R. p. 219.) He did not further describe the test nor mention its results.[3]

James W. Forbes, an Indiana State Police chemist, testified that he

"ran a series of what are called color tests, and these tests are merely designed to indicate what might possibly be present. The result of these tests indicated the possible presence of a hallucinogen, which would be LSD in this case." (R. 355.)

He then "ran what is called an ultraviolet spectrum of the drug . . . [which] indicated that an area of absorption of light at, of 308 millimicrons, which is the same area in

---

3. The State's brief, at page 18, says: "Officer Dolen made a test on the tablet that Jansen had gotten from Schmitt, and it had indicated that it was L.S.D. (Tr. 219)." We can find nothing on page 219 of the Record, nor at any point in Jansen's testimony, or in Dolen's testimony, to the effect that Dolen's test "indicated that it was L.S.D.", or that it indicated anything. On p. 273 of Dolen's testimony he was asked what his finding was on the test but he did not answer because defendant's objection was sustained. On another occasion, p. 271, he answered, "I did run a what they call a preliminary test on the tablets which showed possible". At that point he was interrupted by defendant's objection which was sustained. The court also struck out "which showed possible".

which LSD shows an absorption." (R. 355.) On cross-examination he testified that 308 millimicrons is the maximum absorption of light and that other substances show this maximum absorption, including ergotamine, which is used in birth control, and ergotaxine, which is used to maintain normal cycles of menstruation. Also, that ergot alkaloid is the parent material from which LSD is synthesized; that it is in ergotamine and ergotaxine, but that anything containing an ergot alkaloid is not necessarily a hallucinogen, although ergot alkaloids also show the 308 maximum absorption of light. (R. 361-3.)[4]

Giving the evidence the interpretation and weight most favorable to the State it will sustain a finding that the tablets delivered by defendants to Roy Couts and Terry Jansen were represented by defendant to be LSD and that chemical tests demonstrated that they could be LSD, but that they could have been some other drug containing, or manufactured from, an ergot alkaloid.

If it were essential to a conviction that the record contain substantial evidence of credible value that defendant did actually "sell a dangerous drug, to-wit: Lysergic Acid Diethelamide, also known as LSD",[5] we would be required to reverse. But the fact is that the Dangerous Drug Act[6] defines a punishable sale of dangerous drugs as:

"any and every sale and includes . . . (2) exposure, offer and any other proffer, *whether or not the offerer has the present ability or capability to complete said transaction by delivering dangerous drugs* . . .

"(emphasis added [by the Supreme Court]). A literal

---

4. He never did, as the State's brief (p. 18) states, testify that "he was satisfied that [the tablet he analyzed] was LSD". In fact, he never testified that any test revealed it to be LSD or that he believed in any degree that it was LSD. Merely that the first series of tests "indicated the possible presence of . . . LSD" and the second test indicated absorption in "the same area in which LSD shows absorption."

5. The words of the charging affidavit.

6. IC 1971, 16-6-8-1, et seq., which at the time of the alleged incident here in question and at the time of trial, was also Ind. Ann. Stat. § 35-3331, et seq. (Burns 1972 Supp.) and is now IC 1971, 16-6-8-1, et seq. (Burns Code Ed., 1974).

interpretation of that definition would mean that the statute is violated when the offer is made, subsequent events notwithstanding."[7]

The First District of the Court of Appeals of Indiana affirmed the conviction of a defendant charged with selling marijuana when the evidence showed that ragweed was delivered, saying that "[w]hen the transaction is measured against the previously quoted definition of a sale, we find that whether or not the material delivered is, in fact, a dangerous drug matters not under the facts of this case [i.e., that] . . . 'the substance was held out to be cannabis, payment was made for cannabis and the buyer believed he had cannabis', thereby completing a sale as defined by the applicable statute."[8] On transfer the Indiana Supreme Court reversed because "in our opinion, the evidence is insufficient to find either a criminal offer or sale by appellant-Keith Pryor. . . ."[9] The court declined to say what its holding would have been had the evidence been sufficient to sustain a finding that Keith Pryor made or participated in the making of the offer to sell marijuana. But its failure to expressly disapprove of our First District's conclusions of law based on such a finding cannot be lightly ignored. We, therefore, feel constrained to hold that the literal interpretation of the definition in IC 1971, 16-6-8-2(H) (Burns Code Ed. 1974) is the law until we are told otherwise.

We therefore affirm the judgment notwithstanding what appears to be a failure by the State to elicit any substantial evidence of probative value to the effect that any of the tablets delivered by defendant were the dangerous drug known as LSD, or Lysergic Acid Diethlamide. We affirm solely because there is substantial evidence of probative value in the record to the effect that

7. *Pryor* v. *State* (1973), 260 Ind. 408, 411, 296 N.E.2d 125, 126, 36 Ind. Dec. 484, 486.
8. *Pryor* v. *State* (1973), Ind. App., 291 N.E.2d 370, 372, 34 Ind. Dec. 629, 633.
9. 260 Ind. 408, 411, 296 N.E.2d at 127, 36 Ind. Dec. at 486.

appellant offered to sell the dangerous drug known as LSD or Lysergic Acid Diethlamide.[10]

Judgment affirmed.

Buchanan, J., concurs; Sullivan, P.J., concurs in result.

NOTE.—Reported at 310 N.E.2d 73.

10. The Dangerous Drug Act (IC 1971, 16-6-8-1 *et seq.*) was originally Acts 1961, Ch. 45, p. 81. In 1967, the amendments included an addition to section 2(j), the "dangerous drug" definition section, of clause (4) which added the definition: "any hallucinogenic, psychedelic, psychotogenic drug, or substance including but not limited to lysergic acid diethylamide, commonly known as LSD." That definition survived (with only the 1971 change of "psychotogenic" to "psychogenic") until 1973 when it was deleted by P.L. 144. The offer and the delivery herein were made on February 28, 1972, verdict was returned May 18, 1972, and the defendant was sentenced June 8, 1972.